**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH GOOGLE ACCOUNTS, COOKIEIDS, AND IP ADDRESSES THAT CONDUCTED GOOGLE SEARCHES THAT ARE STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF 18 U.S.C. § 2332a AND 26 U.S.C. § 5861(d) | Misc. No. | Case: 1:23–mc–00067 Assigned To : Meriweather, Robin M. Assign. Date : 7/7/2023 Description: Civil Misc. (O–Deck) |
| | | **FILED UNDER SEAL** |

**GOOGLE LLC'S MOTION TO QUASH SEARCH WARRANT**
**AND STATEMENT OF POINTS AND AUTHORITY IN SUPPORT**

Google LLC ("Google") respectfully moves this court to quash the April 19, 2023, search warrant issued in Case No. 21-sc-542 with the caption *In the Matter of the Search of Information Associated with Google Accounts, CookieIDs, and IP addresses that conducted Google searches that are stored at premises controlled by Google LLC pursuant to 18 U.S.C. § 2703 for investigation of 18 U.S.C. § 2332a and 26 U.S.C. § 2861(d)* ("Warrant"). As stated more fully herein, the Warrant is overbroad, insufficiently particular, fails to meet the rigorous Fourth Amendment standards required of a warrant targeting First-Amendment-protected activity and associations, and is unduly burdensome.

**INTRODUCTION**

In the days leading up to January 6, 2021, when a joint session of Congress would count the Electoral College votes in the hotly contested presidential election, Americans took to the Internet to understand events as they unfolded and to engage in political discourse and association. Millions exercised their First Amendment freedoms by using Google Search to access news and gather information about, among other things, how to engage with political parties, contact party leadership, donate to political causes, or volunteer with political organizations.

1

The government now seeks to use those search histories to obtain sensitive personal information about potentially *thousands* of Google users as part of its long-running investigation into a crime that occurred in Washington, D.C., on January 5, 2021, when an unknown suspect placed pipe bombs near the headquarters of the Republican National Committee ("RNC") and Democratic National Committee ("DNC"). The government obtained the Warrant, signed on April 19, 2023, which directs Google to disclose to the government the identities and other private information of 311 users who submitted 537 Google searches related to the RNC or DNC over the period between January 1 and 5, 2021 (the "querying users"). The Warrant additionally requires disclosure of the identities and other private information of potentially *thousands of additional persons* who had some tenuous technical connection to a querying user, such as having logged in to their Google Account via the same public Wi-Fi network (the "technically connected users"). This is the *fourth* reverse search warrant that the government has served on Google in its more than two-year effort to identify a suspect.

The Warrant's requirement that Google disclose the identities of hundreds of querying users is grossly overbroad in violation of the Fourth Amendment and targets users based on their First-Amendment-protected activities. The hundreds of querying users are almost certain to include innocent party members, political leaders, party volunteers, DNC and RNC employees, and citizens who sought to contact the parties to donate or voice their opinions. And because the search terms targeted in the Warrant include generic phrases like "dnc location" and "rnc address," the Warrant will also sweep in people who searched for information entirely unrelated to the political committees, such as businesses that share the initials DNC and RNC. The government has no apparent factual basis to believe that any one of the queries was submitted by a suspect.

The Warrant does not stop there: it also directs Google to disclose to the government the identities of all users whose accounts share technical attributes, including login IP addresses and cookies, with the querying users. Google must, therefore, identify and provide information regarding not only the 311 users who submitted the 537 queries, but also unknown numbers of other users who may (or may not) be personally associated with them. A technically connected user's association with a querying user may be personal, even intimate—they could be family members, friends, romantic partners, roommates, or coworkers using a common device or network. Or the association may be entirely impersonal and happenstance—they could be strangers who at any time logged in to their Google Accounts via a common public IP address, such as at a library, college dormitory, airport, or coffee shop. A single querying user who logged in to their Google Account on a public Wi-Fi network could be connected by IP address to *thousands* or more users. The demand for technically connected users, therefore, likely will increase several-fold the number of users whose identities Google must disclose to the government. Because the government does not know *anything* about the technically connected users besides the fact that they are technically connected to a yet-unidentified querying user—no less how many technically connected users will be implicated by the search—it lacks an adequate factual basis to believe that each of them has some connection to the crime.

The Warrant would authorize the government to scrutinize potentially thousands of people based on their exercise of core expressive, associational, and political freedoms. The founding generation recognized the threat posed by general warrants that granted the government unchecked power to pry into citizens' thoughts, associations, and political affiliations, and it proscribed them. The Warrant violates the Fourth Amendment's prohibition on general searches and would intrude

upon and chill core exercises of political activity and association protected by the First Amendment. It must be quashed.

**BACKGROUND**

**A.      Keyword warrants target an unknown number of unidentified users based on the contents of their private Google searches.**

Each month, over a billion people around the world use Google Search to obtain information, ideas, and inspiration. Ex. A, Declaration of Nikki Adeli (hereinafter "Adeli Decl.") ¶ 5. Google users enter billions of queries every day that reveal their private thoughts, interests, and associations. *Id*.; *see Riley v. California*, 573 U.S. 373, 395–96 (2014) (describing how "[a]n Internet search and browsing history… could reveal an individual's private interests or concerns— perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD"). The freedom to privately search for and access information allows Internet users to explore the full range of their thoughts, interests, and concerns without self-censorship or fear of reprisal.

The Warrant is a novel type of search, sometimes referred to as a "keyword" search, that targets an unknown number of unidentified people based solely on the contents of their private Google searches. Adeli Decl. ¶ 4. In most investigations, the government identifies a suspect or person of interest and *then* applies for a warrant to search and seize data from a particularly specified user account. By contrast, when the government applies for reverse search warrants, including keyword warrants like the one here, it generally does so *without knowing the identity of the user whose information is sought*.[1]

---

[1] Numerous courts have published opinions addressing the government's use of geofence warrants, a type of reverse search that targets users' Location History. *See, e.g.*, *Matter of Search of Info. that is Stored at Premises Controlled by Google LLC*, 579 F. Supp. 3d 62, 69 (D.D.C. 2021) ("the perpetrator of the crime being unknown to law enforcement, the [reverse location] warrant identifies the geographic location where criminal activity happened and seeks to identify cell phone users at that location when the crime occurred").

Because the government knows very little about its target, a keyword warrant application necessarily requires it to speculate that the unidentified target may have (1) been a Google user and (2) searched for the terms or phrases specified in the warrant using a Google service during the search period. To respond to a keyword warrant, Google generally must search for the terms or phrases listed in the warrant across a database of potentially billions of stored searches to locate and produce to the government any responsive queries and identifying information for the users who submitted them. *See id.* ¶ 7. This data is typically produced in a two-step process. *Id.* ¶¶ 9-11. At Step 1, Google produces responsive queries and limited, anonymized information about those queries, including a timestamp and the querying user's estimated location. *Id.* ¶ 9. The government then reviews that data to determine which queries, if any, are relevant to its investigation. *Id.* ¶ 11. At Step 2, Google must "unmask" those particular users who submitted the subset of relevant queries identified by the government by providing their identifying and other information, as defined in 18 U.S.C. § 2703(c)(2). *Id.*

**B.      The government has already identified more than 370 users through an ever-expanding series of reverse searches in this investigation.**

The Warrant is the *fourth* reverse search warrant the government has submitted to Google in connection with this investigation. In early 2021, the government obtained two geofence warrants covering areas that included the DNC and RNC headquarters, where the explosive devices were placed. The first warrant, issued on January 11, 2021, defined three search areas covering a collective 4.37 acres of Capitol Hill ("Reverse Warrant 1"). Ex. B, Jan. 11, 2021, Geofence warrant Ref. # 5233066; Adeli Decl. ¶ 22. The government unmasked 58 of the 64 responsive devices. Adeli Decl. ¶ 22. The government unmasked those users in tranches, *id.*, which indicates that it initially determined only a small subset of devices to be relevant, but continued to unmask additional users to expand the pool of individuals subject to its scrutiny.

That search was apparently not fruitful because the government obtained a second geofence warrant on February 10, 2021 ("Reverse Warrant 2"). *See* Ex. C, Feb. 10, 2021, Geofence Warrant Ref. # 5352144; Adeli Decl. ¶ 23. The second geofence warrant expanded the search areas *tenfold* to cover a collective 43.3 acres that included the DNC and RNC headquarters and also hundreds of homes, at least two hotels, and a portion of the Library of Congress. Adeli Decl. ¶ 23. The government unmasked 64 of the 210 responsive devices, but it appears that those searches also did not provide any meaningful investigative leads. *Id.* In total, the government obtained identifying information for *122 users* responsive to the two geofence warrants. *Id.* ¶ 24.

On February 16, 2021, after the government had submitted to Google Reverse Warrant 2 but before it had obtained any responsive account-identifying information, the government obtained its third reverse warrant, a keyword search warrant ("Reverse Warrant 3"). Ex. D, Keyword Warrant Ref. # 5378443. Reverse Warrant 3 required Google to search for and produce to the government any stored user queries submitted to Google Search or Google Maps for any of 66 listed search terms. Ex. D Attachment A. The warrant authorized the government to search for and seize only "Step 1" data. *Id.* Attachment B. The warrant required the government to apply for additional legal process to seize "Step 2" identifying information for any of the querying users. *Id.*

Reverse Warrant 3 divided the search terms into two groups. The first group of 26 search terms sought to capture users who, between January 1, 2021, at 12:01 a.m. and January 5, 2021, at 9:00 p.m. EST, submitted searches that were (a) variations on the addresses of the DNC and RNC headquarters in Washington, D.C. (e.g., "310 First St. SE" and "430 South Capitol St. SE"); or (b) combinations of one of the terms "Democratic National Committee," "Republican National Committee," "DNC," or "RNC" and one of the terms "address," "location," "security," "camera," or "map" (e.g., "'DNC' and 'Camera'" and "'RNC' and 'Map'"). *Id.* Attachment A. The search

terms yielded 1,823 responsive queries submitted by approximately 910 Google users. Adeli Decl. ¶ 12. Those queries included content revealing users' political associations, interests, and activities, including, for example, searches for "republican national committee address for donations to theGOP election fund" and "why was obama's dnc address of 2004 important." Ex. E, Annotated Group 1 Search Results for Reverse Warrant 3.[2] They also revealed content with no relation whatsoever to the Democratic National Committee or Republican National Committee, including "dnc-fh22 panansonic camera how muchnis it," "dnc auto repair address," and "nursing registered RNC ka address." *Id*.

The second group of 40 search terms sought to identify users who, between January 5, 2021, at 7:00 p.m. and January 6, 2021, at 1:00 p.m. EST, submitted searches that included combinations of one of the terms "DNC," "RNC," "Democratic National Committee," "Republican National Committee," "DC," "District," or "Washington, DC" and one of the terms "bomb," "explosive," "explosion," "attack," or "blast" (e.g., "'bomb' and 'DNC'" and "'blast' and 'RNC'"). Ex. D Attachment A. Those search terms yielded 905 responsive queries submitted by approximately 431 Google users. Adeli Decl. ¶ 12. The search swept in a large number of queries clearly unrelated to the pipe bombs, including, for example, "Why did Winston Churchill and

---

[2] Pursuant to its standard production policy, Google did not maintain a copy of the Reverse Warrant 3 production file. Adeli Decl. ¶ 10. All descriptions of the Reverse Warrant 3 search results, including the number of responsive queries and users, are based upon Google's records of the search. *Id*. ¶ 13. The quoted user queries are sourced from a copy of the Reverse Warrant 3 production files, which were provided by the government to Google in October 2022. Ex. E is a copy of the Step 1 production for the first group of 26 search terms, annotated to show the queries the government unmasked via follow-up legal process for Step 2 data in 2021 (highlighted in yellow) and those queries that are the subject of the present Warrant (highlighted in green). Ex. F is a copy of the Step 1 production for the second group of 40 search terms. While none of the queries from the second group of search terms are the subject of the present Warrant, the government sought Step 2 data for more than 100 users associated with those queries in 2021. Adeli Decl. ¶ 14. The queries are reproduced from the production files verbatim, inclusive of typographical and spelling errors.

Franklin Roosevelt meat for three weeks Washington DC shortly after the Japanese bomb Pearl Harbor 1941," "12V DC safety battery explosion," and "ac dc song it's like a bomb that's ready to blow." Ex. F, Group 2 Search Results for Reverse Warrant 3.

Google complied with Reverse Warrant 3 by producing the full text of the 2,728 responsive queries submitted by approximately 1,341 users and data corresponding to each of those queries and users, including a timestamp indicating when the query was submitted, the estimated coarse location of the user (e.g., "United States – Texas" or "Canada – Quebec"), and a truncated, anonymized user identifier.[3] Exs. E, F; Adeli Decl. ¶ 12. The government obtained additional legal process between March and July 2021 directing Google to disclose "Step 2" identifying information for approximately 251 users. Adeli Decl. ¶ 14; Ex. E, Annotated Group 1 Search Results for Reverse Warrant 3. But here again, to Google's knowledge, the government's seizure of the private information of 251 users did not lead to the identification of the person who planted the pipe bombs or otherwise meaningfully advance the government's investigation.

More than one year later, on October 5, 2022, the government obtained another warrant directing Google to produce "Step 2" identifying information for an additional 311 users whose queries the government had previously seized pursuant to Reverse Warrant 3. Ex. G, October 2022 Step 2 Warrant Ref. # 25068018; Adeli Decl. ¶ 15. Google was unable to comply with the warrant because, pursuant to its standard retention practices, it had purged the Reverse Warrant 3 production files. Adeli Decl. ¶ 15. The government withdrew that warrant on November 10, 2022, but informed Google's counsel that it would seek a keyword warrant for similar data. In response, Google's counsel sent the government a letter detailing, among other things, Google's concerns

---

[3] Queries submitted by a signed-in user with Web & App Activity enabled were identified by a truncated Google Account identifier, called a GAIA ID. All other users were identified by a truncated browser Cookie ID. Adeli Decl. ¶ 9.

that the government could not establish probable cause for yet-another keyword search warrant and that the proposed search would raise serious First Amendment concerns. Ex. H, Dec. 7, 2022, Letter to Government Regarding Proposed Keyword Search. Google also previewed for the government the fact that, in light of the substantial passage of time, it may no longer have records of all 537 queries because users may have deleted their search histories or data may have been purged pursuant to Google's standard data retention practices. *Id.* at 5. Google requested a meet and confer with the government in the event the government intended to apply for another keyword warrant. *Id.* at 7. The government did not honor that request.

**C.    The current Warrant expands upon previous searches and would unmask potentially thousands of users based on their political activities and associations.**

Without further engagement, the government obtained the present Warrant on April 19, 2023. Ex. I, April 19, 2023, Keyword Warrant Ref. # 33903075. The Warrant, issued *more than two years* after the government unmasked 122 users pursuant to geofence Reverse Warrants 1 and 2, and 251 users pursuant to keyword Reverse Warrant 3, directs Google to search for 537 queries submitted between January 1 and 5, 2021, by 311 users located around the world, and to disclose to the government information identifying both the querying users and technically connected users.[4] *Id.* Google already produced to the government as part of its Step 1 response to Reverse Warrant 3 the 537 queries and associated information. Adeli Decl. ¶ 16. But Google must engage in a new search for those queries to locate information identifying the users who submitted them,

---

[4] These 537 queries were part of the production disclosed to the government in March 2021 pursuant to Reverse Warrant 3. Adeli Decl. ¶ 16. The Warrant requires Google to search for these queries again to locate those queries and any available identifying information for the querying users. *Id.* The government has informed Google that, based on its copy of the March 2021 anonymized production in response to Reverse Warrant 3, the queries resolve to 311 unique truncated identifiers. *See* Ex. H at 5. The government shared its anonymized production copy with Google's counsel, and that production copy indicates the querying users were likely distributed not only across the United States but also across the world. Ex. E, F.

9

and then still more searches to identify those querying users' "devices" and "software" data, all technically connected users, and identifying information for all technically connected users. *Id*. ¶¶ 17–19.

The Warrant directs a search that incorporates some aspects of more typical keyword warrants but also differs from standard, multi-step keyword searches in material ways. First, the Warrant is, in essence, a demand to unmask users whose queries the government seized more than two years ago when Google produced "Step 1" data in response to Reverse Warrant 3. Adeli Decl. ¶¶ 16–17. (Indeed, the government reviewed the 537 queries and associated information in 2021 and chose not to unmask the users who submitted them at that time.) But unlike the unmasking "Step 2" legal process that the government obtained in 2021 to identify 251 users, the Warrant directs Google to disclose not only (i) identifying information for querying users, but also (ii) "[a]ll records pertaining to devices associated with the [querying users] and software used to create and access [their accounts]," including "any . . . unique identifiers that would assist in identifying any such device(s)" and (iii) information identifying all users *ever* connected by technical means such as "a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (e.g., credit card number), registration or login IP addresses, registration or login cookies or similar technologies, or any other unique device or user identifier" to querying users. Ex. I Attachment B.I(a)–(c).

Google must devote substantial employee and computing resources to locate and produce the three categories of data. Adeli Decl. ¶¶ 17–19. To produce the first category, Google personnel must create, execute, and monitor numerous queries designed to capture the 537 user queries and then search for and disclose available account information, including names, email addresses, backup email addresses, payment information, types of services utilized, device identifiers, and

session IP addresses, for the 311 users who submitted those queries. *Id.* ¶¶ 7–8, 17. To produce the second category, Google personnel must search in each querying user's account for each of the 15 types of records listed, as well as for any other "unique identifiers" that may assist the government in identifying any devices associated with the querying user's accounts. *Id.* ¶ 18. To produce the third category, Google personnel must search each of the querying user's accounts for the data listed (e.g., all IP addresses associated with the querying user's logins), and then search for all other users technically connected to that data (e.g., all users who logged in via the identified IP addresses), and then search for identifying information for every one of the technically connected users. Adeli Decl. ¶¶ 19–21. The production would, in combination with a user's Search history, reveal a great deal about a querying user including their personal information (including their name, account identifiers, and credit card information) as well as information about their devices, software, and account usage. *Id.*

The Warrant's demand that Google produce identifying information for users technically connected to the querying users will significantly increase the number of users affected by the search. *Id.* The identification of technically connected users has the potential to reveal intimate, personal, professional, political, and ideological associations. It can tell the government who lives together, works together, and spends time together. But it can also reveal large numbers of strangers who, at some time (and not necessarily at the *same* time) logged in to their Google Accounts via the same public Wi-Fi access point or the same computer. *Id.* ¶ 21. By identifying the individual who submitted the query and all users technically connected to the querying individual, the government will be able to determine who is interested in "rnc location" as well as both their intentional and chance associations. The technically connected users swept into the government's expansive search could include, for example, a querying user's minor children,

officemates, fellow worshipers, Alcoholics Anonymous group members, and potentially hundreds or more strangers who, at some point in time, passed through an airport, coffee shop, or medical center that the querying user also once visited. Because the Warrant directs Google to disclose both sets of data at the same time, the government will have identified all users technically connected to the querying users before it knows who the querying users are and can determine whether any one of them is relevant to its investigation.

On May 2, 2023, Google's counsel informed the government that Google was reviewing the Warrant and would not be able to comply with its 14-day production period. The government did not respond. On May 22, 2023, Google's counsel requested a meet and confer to discuss alternatives to litigation. On May 24, 2023, Google's counsel conferred telephonically with the government to discuss Google's anticipated challenge of the Warrant and the government's position. Having failed to reach a resolution of this matter, Google now moves to quash the Warrant pursuant to the First, Fourth, and Fifth Amendments of the United States Constitution, 18 U.S.C. § 2703(d), and Federal Rule of Criminal Procedure 41.

## ARGUMENT

The Fourth Amendment protects individual privacy by placing strict limits on governmental investigatory power. It protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by establishing that:

> no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Amendment's "basic purpose" is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (citation omitted).

The warrant requirement protects against that evil by requiring the government to establish particularized probable cause for every search and seizure. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The government must describe with particularity the places to be searched and items to be seized and demonstrate that every search will likely produce evidence of a crime, thus preventing the government from conducting "a general, exploratory rummaging in a person's belongings." *Carpenter*, 138 S. Ct. at 2213; *see also Riley*, 573 U.S. at 403 ("[T]he Fourth Amendment was the founding generation's response to the reviled 'general warrants' . . . which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity."). A warrant with an "indiscriminate sweep" is "constitutionally intolerable." *Stanford v. Texas*, 379 U.S. 476, 486 (1965). And where a search implicates activities protected by the First Amendment, such as political speech or freedom of association, the government must meet those Fourth Amendment standards with scrupulous exactitude. *Id*. at 485.

The Warrant does not satisfy these basic Fourth Amendment requirements, and certainly not with exactitude. The Warrant is vastly overbroad. It authorizes the government to comb through the private searches of, and to seize identifying information for, 311 Google users, located all over the world, who searched for the 537 listed queries that do not, on their face, relate to criminal activity. Worse, it authorizes the government to seize information identifying all users merely *technically connected* to the querying users, thereby extending the Warrant's reach to potentially thousands of additional users. The government cannot carry its burden to establish a nexus between the crime and each of the querying users—much less any one of the technically

13

connected users. The government merely hopes that by seizing identifying and other personal information about potentially thousands of users, it may identify its suspect. But the Fourth Amendment prohibits the government from seizing the haystack to find the needle. *Cf. United States v. Hill*, 459 F.3d 966, 975 (9th Cir. 2006). The government's expansive and fruitless searches and seizures in this investigation illustrate why exploratory searches are forbidden: the government has already used four reverse warrants to seize private information about more than 370 users based on their private searches or location data without substantially advancing its investigation.

The Warrant authorizes a general search that would infringe upon users' Fourth and First Amendment rights. It may also chill Internet use and political discourse more broadly, creating a general fear that, by using an Internet search engine, any citizen can become entangled in a criminal dragnet. It fails to apply the Fourth Amendment standards with the exactitude required of a search targeting First Amendment protected information.

Finally, the Warrant is unduly burdensome, requiring Google to conduct an unconstitutional search of substantial magnitude. The Warrant must be quashed.

## I.   The Warrant is Overbroad Because It is Not Supported by Particularized Probable Cause.

The government must establish probable cause for each place to be searched and each item to be seized. *Groh v. Ramirez*, 540 U.S. 551, 560 (2004). To establish probable cause, the government must possess personal knowledge or reasonably trustworthy information from others sufficient to warrant a person of reasonable caution to conclude that (i) evidence will be found in each place searched and (ii) each item identified for seizure will constitute evidence of the crime. *Florida v. Harris*, 568 U.S. 237, 243 (2013); *see also Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (probable cause "must be particularized with respect to the person to be searched or seized"

(citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979))). While probable cause does not require certainty, mere belief and speculation is not sufficient. *Brinegar v. United States*, 338 U.S. 160, 175 (1949). To establish probable cause to seize any particular item, the government must demonstrate a nexus between that item and the criminal activity. *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017); *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967). Consequently, a warrant cannot authorize the government to search any place or seize any evidence with respect to which it has not demonstrated probable cause. *Id.*

The Warrant authorizes the government to seize 537 user queries and available identifying information for potentially thousands of querying and technically connected users located across the world. Adeli Decl. ¶¶ 16–21. Although Google does not have access to the government's affidavit, it is evident from the scope of the search and the government's history of using reverse warrants in this investigation that the government cannot demonstrate particularized probable cause to believe that information regarding any one of the querying users or technically connected users—let alone *all* of them—will constitute or contain evidence of the crime. The search, which infringes upon the privacy and associational rights of hundreds (if not thousands) in the mere hope of identifying one, is the epitome of overbreadth.

### A.    The search and seizure of identifying and other information for the 311 querying users is overbroad.

While keyword searches remain relatively novel, case law addressing searches of email accounts and phones is instructive. To establish probable cause to search a known suspect's email account, the government must demonstrate "a direct connection between the alleged criminal activity and the specific email account at issue, [which] typically arises because the affidavit asserts that the account was used in the commission of the crime." *United States v. Ali*, 870 F. Supp. 2d 10, 37 (D.D.C. 2012). "To require anything less would be to authorize a general,

exploratory rummaging in a person's belongings contrary to the Fourth Amendment's prohibition against general warrants." *Id.* (quotations and citations omitted); *see also Griffith*, 867 F.3d at 1272 (warrant to search the defendant's home for a cell phone was not supported by probable cause where law enforcement had no basis to believe the defendant owned a cell phone or, if he did, that it would contain evidence of a crime).

Here, the government cannot establish particularized probable cause to search for and seize identifying information for each of the 311 querying users. *See Ali*, 870 F. Supp. 2d at 37; *cf. Minnesota v. Dickerson*, 508 U.S. 366, 376 (1993) ("The Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures.").

The 311 users have no apparent connection to the crimes under investigation. They may have searched for the Committee addresses to navigate to them to volunteer, attend meetings, or gather at the Committee social clubs, or to mail letters or political donations. The users likely include Committee employees commuting to or from work, political leaders and their staff, party members, and people wishing to contact the parties. Here are just a few examples of the large number of users who searched for the street addresses of the DNC or RNC headquarters whose identifying information the government would seize pursuant to the Warrant:

- A user in *Florida* who searched "*430 South Capitol Street SE Washington DC 20003*" on January 1, 2021 (row 19);

- A user in *Kuala Lumpur* who searched "*310 First Street SE Washington, D.C*" on January 1, 2021 (row 93);

- A user in *Texas* who searched "*Republican National Committee (RNC), 310 1st St SE Washington, DC, 20003-1885*" on January 2, 2021 (row 321);

- A user in *Spain* who searched "*310 First Street SE Washington, D.C.*" on January 2, 2021 (row 471);

- A user in *The Philippines* who searched "*Democratic National Committee, 430 South Capitol St SE #3, Washington, DC 20003, United States*" on January 3, 2021 (row 617);

- A user in *Wyoming* who searched "*430 South Capitol Street SE, Washington, DC 20003*" on January 3, 2021 (row 780);

- A user in *Australia* who searched "*310 First St SE, Washington, DC 20003, USA*" on January 4, 2021 (row 884); and

- A user in *Iowa* who searched "*430 South Capitol Street SE, Washington, DC 20003*" on January 4, 2021 (row 946).

Ex. E. Similarly, the Warrant authorizes the government to seize identifying information for people located across the world who queried terms over a nearly four-day period that have no clear tie to the DNC or the RNC headquarters in Washington, D.C. These users include, among many others:

- A user in *California* who searched "*republican national committee email address*" on January 1, 2021 (row 4);

- A user in *Alabama* who searched both "*rnc address*" and "*dnc address*" on January 1, 2021 (rows 244–45);

- A user in *New York* who searched "*republican national committee address corning*" on January 2, 2021 (row 383);

- A user in *Virginia* who searched "*DNC security*" on January 3, 2021 (row 883);

- A user in *India* who searched "*DNC address*" on January 4, 2021 (row 1071);

- A user in *Texas* who searched "*dnc location*" on January 4, 2021 (row 1348); and

- A user in *Oregon* who searched "*Republican National Committee address*" on January 5, 2021 (row 1446).

*Id*. These queries were very likely submitted by individuals searching for information with no connection whatsoever to the crimes under investigation, including people searching for the locations of DNC and RNC offices in other states, the locations of the DNC and RNC conventions or information about convention speeches (also referred to as "addresses"), the email addresses

associated with the DNC and RNC, and information about businesses, organizations, and people that coincidentally share the initials "DNC" and "RNC."

The substantial variation between the searches included in the Warrant confirms that the government lacks particularized probable cause for all of them. If, for example, the government had reason to believe the suspect was the individual in California who submitted a search on January 1, 2021, for the email address of the RNC (*id.* row 4), then that would appear to undermine particularized probable cause to search and seize information about the individual in Australia who submitted a search on January 4 for the physical address of the RNC (*id.* row 884).

The facial deficiency of the Warrant is further demonstrated by the breadth of information that the government is authorized to both search and seize. First, instead of focusing on a single user or query or a small number of users or queries, the Warrant authorizes the government to seize identifying information for *311 users* who submitted *537 queries*. Ex. I Attachments A–B; Adeli Decl. ¶ 16. Second, the search terms vary substantially in their specificity, ranging from those that target the street addresses of the DNC and RNC headquarters in Washington, D.C., to those that have no clear connection to those locations or even the Committees at all (compare "430 South Capitol Street SE Washington DC 20003" with "dnc location" with "republican national committee email address"). *See* Ex. I Attachment A at 1, 3, 23. Third, the search focuses on queries submitted over a four-day period. *Id.* Attachment A. Fourth, the search terms are both common and innocuous, with no link to criminal activity, so the government is necessarily targeting hundreds of innocent users in the hope of finding one guilty one. And, finally, the Warrant is not limited to users in a particular city, state, or even country; it instead targets users scattered across the world. *See* Ex. E.

The variation and breadth of the queries the government seeks to unmask confirm that the government has not established the necessary nexus between every one of these queries and the crime under investigation. *Griffith*, 867 F.3d at 1271. Being unable to establish particularized probable cause to search and seize identifying information for *each* of the querying users, the government would simply seize them all. *See, e.g., Lane v. District of Columbia*, 211 F. Supp. 3d 150, 168 (D.D.C. 2016) (discussing the probable cause showing necessary to arrest multiple individuals where the evidence does not point exclusively to one particular individual, and noting that "a mass arrest of everyone in a park, for example, crosses a clearly established line, even where there is probable cause to believe that *some people* present . . . had committed arrestable offenses." (emphasis in original) (cleaned up)). This "'round 'em all up' approach to law enforcement" is plainly precluded by the Fourth Amendment. *Id.*

**B.    Case law addressing the constitutionality of geofence searches strongly supports the conclusion that the Warrant is overbroad.**

This Court recently addressed the validity of a geofence warrant issued to investigate crimes at the Capitol on January 6, 2021. *United States v. Rhine*, No. CR 21-0687 (RC), 2023 WL 372044 (D.D.C. Jan. 24, 2023). The Court approved a warrant because it was narrowly drawn and based on clear, articulable reasons to believe the devices searched would constitute evidence: it defined a single search area tailored to the contours of the Capitol building for a four-and-a-half-hour search period when illegal activity was occurring in and around the building. *Id.* at *18, *31-32. The warrant also directed the Government to use control lists to strike from the results devices that were lawfully in the Capitol. *Id.* at *18. The Court rejected the defendant's argument that the geofence warrant had been unconstitutionally overbroad, holding that the "unique facts" of the case supported an "unusually broad scope of probable cause" that the search did not exceed. *Id.* at 30. Because the Capitol building was not open to the public on January 6, "the fact of having

entered the building during the geofence time frame itself constitutes evidence of a crime." *Id.* at *29. Moreover, there was ample evidence, including from Capitol surveillance footage and social media posts, that those people who entered the Capitol unlawfully possessed and were using their cell phones. *Id.* The Court noted that the search area and period were carefully tailored to capture criminal activity within the Capitol and to avoid sweeping in people who were not within the Capitol. *Id.* at *31. And the absence of businesses in close proximity to the Capitol and road closures in place during the search period further mitigated the likelihood that the search would impact a large number of people unrelated to the crime. *Id.* at *31. The Warrant here reflects no similar circumspection or precision.

By contrast, the Eastern District of Virginia found a geofence warrant unconstitutionally overbroad where the search area extended beyond the crime scene and impacted multiple innocent people whose only connection to the crime was their proximity to it. *United States v. Chatrie*, 590 F. Supp. 3d 901 (E.D. Va. 2022). *Chatrie* involved a geofence warrant issued in an effort to identify a suspect who committed an armed bank robbery in a Virginia suburb. The warrant authorized a 1-hour search of a 150-meter radius area (17.5 acres) that covered the scene of the crime (the bank) and a nearby church. *Id.* at 918. The search yielded 19 responsive devices. *Id.* at 920. The court found it "difficult to overstate the breadth" of the warrant, "particularly in light of the narrowness of the Government's probable cause showing," which had relied largely on the mere fact that "the perpetrator 'had a cell phone in his right hand and appeared to be speaking with someone on the device.'" *Id.* at 930. Further, the warrant "lacked any semblance of" the particularized probable cause required to search each individual within the geofence. *Id.* at 927.

Every case to address the lawfulness of a geofence search, including *Rhine* and *Chatrie*, has recognized that a warrant will be overbroad where the search is not carefully tailored to avoid

impacting a large number of innocent people with no connection to the crime. *See, e.g.*, *Matter of Search of Info. Stored at Premises Controlled by Google LLC*, 579 F. Supp. 3d 62 (D.D.C. 2021) (granting geofence warrant application where the search areas were strictly limited to the precise areas the suspects were known to have been, where CCTV footage indicated that the suspects were either alone in the geofences during the search periods or, at most, two to three other individuals were in the geofence with the suspects, and where the eight search periods authorized by the warrant ranged from 2 to 27 minutes each and were tailored to those times the suspects were known to have been within the search area); *Matter of Search of Info. Stored at Premises Controlled by Google*, 481 F. Supp. 3d 730 (N.D. Ill. 2020) (denying geofence application for lack of probable cause and particularity and holding (i) probable cause must be established for every individual within the geofence and (ii) particularity is lacking where the government is permitted "to sort through" results "to identify the suspect by process of elimination" and where the warrant imposes "no limit on the government's discretion to select the device").

The Warrant here would impact substantially more innocent users than those searches that courts have approved in both the geofence and physical-search context. While a lawful search may incidentally impact the privacy of individuals not suspected of a crime, the search must be justified by a reasonable basis to believe that the intrusion upon the innocent individual's protected interests will result in the seizure of contraband or evidence related to the crime. *See, e.g.*, *United States v. Knights*, 534 U.S. 112, 118–19 (2001) ("The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."). Such intrusions upon innocent people are sometimes unavoidable, such as in the context of the search of an office in

which only a small subset of files may constitute evidence of a crime or in the search of a home that the suspect shares with their spouse and children. *See, e.g.*, *Matter of Search of Info. that is Stored at Premises Controlled by Google LLC*, 579 F. Supp. 3d at 84 (citing cases supporting the proposition that "the privacy interests of individuals who are not the target of [the] criminal investigation" may be impacted by a search). But the government's use of the Warrant to intrude on the privacy of potentially thousands of innocent people is neither unavoidable nor incidental. To the contrary, the Warrant *purposefully targets* hundreds of users (or more), despite the fact that the government cannot establish particularized probable cause to search every one of them.[5]

### C. The search and seizure of identifying and other information for users merely technically connected to the querying users is overbroad.

The Warrant's authorization for the government to search and seize identifying information for potentially *thousands of additional users* merely connected to the querying users by IP address, web cookie, or other technical means substantially expands the search's scope and makes the Warrant even more overbroad. The government cannot predict who or even how many users will be affected. It is inconceivable that the government can support a reasonable basis to believe that a search of each of the users technically connected to the as-yet-unidentified querying users will produce evidence of the crime—a conclusion supported by the fact that the government has not charged any of the 370 users it has already unmasked over the three years of its investigation. The

---

[5] Even if the government could establish probable cause to believe that any one of the querying users constitutes evidence of the crime, the more than two-year delay between when the users submitted their queries to Google (January 1–5, 2021) and the government's search undermines any reason to believe that evidence of the pipe bomb suspect will *still* be stored in Google Search records. *See, e.g.*, *Griffith*, 867 F.3d at 1274 (no probable cause to support search of defendant's cell phone where the crime had occurred more than a year prior to the search and the defendant would have had "ample opportunity to delete incriminating information from the device by the time of the search . . . [and] every incentive to cleanse his phone"). The suspect could have deleted their search history or Google may have purged records of the suspect's searches in the ordinary course. The suspect, cognizant of the FBI's intense, public two-year search for their identity, would have had "every incentive" to delete any digital trail connecting them to the crime. *Id.*

government cannot establish probable cause "by piling hunch upon hunch," *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004), particularly when its prior hunches have proven to be incorrect.

IP addresses may be assigned to many different computers or devices over time, so an IP address may correlate to "numerous innocent internet users." *Malibu Media, LLC v. John Does 1 through 12*, No. 12–cv–1261, 2012 WL 2872835, at *4 (E.D. Cal. July 11, 2012). Cookies can likewise be associated with more than one user. *See, e.g.*, *In re Pharmatrak, Inc.*, 329 F.3d 9, 15 n.9 (1st Cir. 2003). Users connected to a querying user by IP address may include the querying user's close associates, such as family members, friends, romantic partners, roommates, and coworkers. But the technical connection can also pick up large numbers of strangers, such as people whose only connection to the querying user is having logged in to their Google Accounts via a common public IP address, such as at a public library, a college dormitory, an airport, or a coffee shop. Accounts connected by cookie may include users who share a private computer, such as family members, as well as strangers who happen to have used the same terminal, such as one located at a library or school. Adeli Decl. ¶¶ 19–21. Under the terms of the Warrant, a user who submitted a search on January 1, 2021, for the address of the DNC headquarters in Washington, D.C., in an effort to mail a political donation would have their query, their identity, and some of their account information disclosed to the FBI, potentially along with the account information and identities of their children and spouse, their coworkers, and strangers with whom they coincidentally shared an IP address or cookie. One innocent user's query could result in the FBI's seizure of information identifying *thousands* of other innocent users. *Id*. ¶ 21.

The Warrant's unpredictable and expansive sweep far outstrips the government's justification for unmasking any single Google user—namely, to identify a suspect for the crimes

under investigation. This Circuit has held, for example, that a warrant authorizing the search and seizure of all cell phones in a home was overbroad where the affidavit offered "almost no reason to suspect that [the person of interest] in fact owned a cell phone, or that any phone or other device containing incriminating information would be found in his apartment." *Griffith*, 867 F.3d at 1276. This Circuit has also held that a search that involves the seizure of "innocuous objects" such as a phone—or here, records of the private political activities and thoughts of hundreds or more individuals—"call[s] for special 'care to assure the search is conducted in a manner that minimizes unwarranted intrusions upon privacy.'" *Id.* (quoting *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976) (cleaned up)). No such care is reflected in the Warrant, which authorizes the government to indiscriminately seize the private searches and identifying information of a large and unknown number of users on the basis of their political activities or associations.

**D.      The Warrant expands upon a previous unfruitful search.**

A comparison of the queries that the government seeks to unmask pursuant to the Warrant and those it unmasked in 2021 shows that the government's search has not narrowed over the past two years, but instead continues to expand. *See* Ex. E.[6] The queries the government seeks to unmask via this Warrant are similar—and in many cases identical—to those it unmasked in 2021. *Id*. Below are examples of just three queries that the government unmasked in 2021 and targets for unmasking today:

---

[6] In 2021, the government identified users who submitted searches that fell within the second set of queries defined in Reverse Warrant 3, namely users who searched terms like "dc bomb threat" and "washington dc hippie bus bomb." Adeli Decl. ¶ 14.    No queries from the second set of search terms are targeted in this Warrant, so the government has, at this time, narrowed its focus to those users whose queries fall within the first set of search terms defined in Reverse Warrant 3.

| 2021 search | 2023 search |
|---|---|
| • A user in **Ohio** who searched "**430 South Capitol Street SE, Washington, DC 20003**" on **January 3** (row 676)<br><br>• A user in **California** who searched "**310 First Street SE**" on **January 3** (row 714)<br><br>• A user in **Nebraska** who searched "**republican national committee headquarters address**" on **January 3** (row 751) | • A user in **Mississippi** who searched "**430 South Capitol Street SE, Washington, DC 20003**" on **January 3** (row 557)<br><br>• A user in **Utah** who searched "**310 first street se**" on **January 3** (row 725)<br><br>• A user in **Virginia** who searched "**republican national committee headquarters address**" on **January 3** (row 733) |

*Id*.

The queries the government targets in this search bear a striking resemblance to the set of queries that the government targeted in 2021—the government just seeks to unmask *more* of them. Unless the government has presented to the Court new information that supports a reasonable basis to believe that the queries listed in the Warrant have qualities that are different from those unmasked more than two years ago—and, therefore, likely relate to the suspect where the others did not—there is no probable cause for the government to seize information related to a user who submitted any single query, let alone all 311 users associated with the 537 queries. Courts have observed that "where an initial fruitless consent search dissipates the probable cause that justified a warrant, new indicia of probable cause must exist to repeat a search of the same premises pursuant to the warrant." *United States v. D. Bowling*, 900 F.2d 926, 932 (6th Cir. 1990); *see also United States v. Dalton*, 918 F.3d 1117, 1128 (10th Cir. 2019) (citing cases supporting the conclusion that new information can dissipate probable cause for a continued or new search).

## II.    The Warrant is Insufficiently Particular

To safeguard against general searches, the Fourth Amendment requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S.

CONST. amend. IV. A warrant is sufficiently particular when, "[a]s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). The particularity requirement is especially critical in the context of a digital search because the government's ease of access to vast amounts of personal data increases the risk that it may conduct wide-ranging searches into individuals' private affairs. *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009).

The Warrant is insufficiently particular because it grants the government unfettered discretion to determine what data constitutes evidence of the crime. The Warrant authorizes the government to seize "[a]ll information . . . that constitutes evidence of violations of 18 U.S.C. § 2332a (Use of Weapons of Mass Destruction) and 26 U.S.C. § 5861(d) (Possession of Unregistered Firearm (Destructive Device) ("Subject Offenses") that were committed by unknown person(s) on January 5, 2021." Ex. I Attachment B.II. But the Warrant fails to provide a single criterion that the government must use to assess whether a particular record constitutes evidence of the listed violations, leaving the question fully to the government's discretion. *See, e.g.*, *United States v. Leary*, 846 F.2d 592, 601–02 (10th Cir. 1988) (finding warrant invalid where it permitted seizure of documents relating to "the purchase, sale and illegal exportation of materials in violation of the federal export laws," and citing cases supporting the conclusion that "reference to a broad federal statute is not a sufficient limitation on a search warrant"). Regardless, the government will have seized all of the user information produced by Google at the time of the production, thereby rendering any limitations (had they been provided) on what may constitute evidence of the crimes meaningless.[7]

---

[7] Notably, Attachment B.III of the Warrant requires law enforcement to sequester and "seal any information from Google that does not fall within the scope of Section I." Ex. I Attachment B.III. Notwithstanding this use limitation on any overproduction by Google, the Warrant contains no

The Warrant is insufficiently particular for the additional reason that it authorizes the government to seize identifying information for a large, unknown number of users. The authorization to seize information regarding all users merely *technically connected to* querying users that the government has not yet identified is nothing short of a general search. *See* Ex. I Attachment B.I(c). In *United States v. Washington*, the Ninth Circuit held that a warrant authorizing the seizure of "evidence of association of Ralph Washington with the following persons, but not limited to them," was "patently overbroad" and "so facially deficient in particularity that the officers could not have acted in 'objectively reasonable' reliance" upon it. 797 F.2d 1461, 1471–74 (9th Cir. 1986). The present Warrant is even more extreme: it requests information about an unknown but likely large number of individuals associated in unknown ways with unknown targets. Stated differently, the Warrant targets unspecified associates of 311 John Does.

Even the Warrant's definition of the technically connected accounts is insufficiently particular. The Warrant authorizes the government to search for and seize private information from any accounts sharing the following technical attributes with the querying users: "common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (e.g., credit card number), registration or login IP addresses, registration or login cookies *or similar technologies, or any other unique device or user identifier*." Ex. I Attachment B.I(c)

---

limitation whatsoever on either (1) the government's retention and use of "evidence" seized pursuant to B.II or (2) the government's retention and use of data produced by Google to the government pursuant to B.I that the government later determines to not constitute evidence of the crimes under investigation. The practical effect of the Warrant is to grant the government *carte blanche* authority to seize *all* of the data Google is directed to produce and to then retain and use that information for any purpose.

(emphasis added). It is unclear what types of data might be "similar technologies" or "unique device or user identifier[s]," and so the question is improperly left to the government's discretion.

Similarly, the description of "[a]ll records pertaining to devices associated with the [querying users' accounts] and software used to create and access" those accounts is insufficiently particular. *Id.* Attachment B.I(b). The Warrant lists 15 nonexclusive examples of data that fall within this category, but broadly authorizes the search and seizure of "any other unique identifiers that would assist in identifying any such device(s)." *Id.* The Warrant then lists three nonexclusive examples of "other unique identifiers" but does not provide any additional guidance regarding what other data is included. *Id.* This authorization, too, improperly leaves to the government's discretion which data to search and seize.

### III.    The Warrant Fails to Meet the Rigorous Fourth Amendment Standards that Apply to a Search Targeting First-Amendment-Protected Activity and Associations.

When a search targets information that may be protected by the First Amendment, as it does here, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Stanford*, 379 U.S. at 485. The exacting application of probable cause and particularity ensures that a search targeting First-Amendment-protected materials will "retain a necessary sensitivity to the freedom of expression." *United States v. Pryba*, 502 F.2d 391, 403 (D.C. Cir. 1974) (recognizing that "[a] seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material"); *cf. Roaden v. Kentucky*, 413 U.S. 496, 504 (1973) (the reasonableness of a search must be examined "in the light of the values of freedom of expression").

The First Amendment protects "the right to receive information and ideas," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969), to speak anonymously, *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), and to receive information anonymously. *See*

28

*Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2388 (2021) (describing the constitutionally protected interest of some citizens in participating in the political process while remaining anonymous). The First Amendment also protects the right to associate with others based upon political, religious, or cultural beliefs. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014) ("[T]the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association."). The right to privacy in one's associations is vital to the freedom of association. *Bonta*, 141 S. Ct. 2383. "Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Id.* (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). These enhanced First Amendment protections are intended to "assure the unfettered interchange of ideas" for the advancement of "political and social changes desired by the people." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976).

The Warrant would unreasonably burden these First Amendment freedoms. "The ultimate touchstone of the Fourth Amendment is reasonableness." *Riley*, 573 U.S. at 381 (cleaned up). In assessing whether a search is reasonable, courts must balance the government's "need to search against the invasion which the search entails." *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 536 (1967); *see also Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985) (a search supported by probable cause may nonetheless be unreasonable if the "nature and quality of the intrusion on the individual's Fourth Amendment interests" is greater than "the importance of the governmental interests alleged to justify the intrusion"). Where the search would require an invasion of citizens' First Amendment freedoms, the Constitution demands more.

Here, the government's interest—and the public's—in advancing the criminal investigation is undoubtedly significant. But the seriousness of the investigation does not by itself justify the search for and seizure of the private information of potentially thousands of people. The government's lack of success with the prior reverse warrants indicates that the Warrant is unlikely to advance the government's investigation in any event.

By contrast, the resulting intrusion upon impacted users and the public at large will be substantial. Hundreds of users would be subjected to the government's scrutiny based on the content of their lawful, private searches for information related to political parties (or what the government perceives to be searches related to political parties but may, in fact, relate to something else entirely). Potentially thousands more would be subjected to the government's scrutiny based on their close or chance association with a querying user.

The *individual* harm to potentially thousands of innocent users wrought by the government's invasion into their anonymous political activities and associations renders the search unreasonable. *Cf. Bonta*, 141 S. Ct. at 2385 (recognizing the harm caused by broad First Amendment intrusions, even where any single demonstrated burden is not severe). Moreover, the *societal* harms wrought by a sweeping exploratory investigation targeting the political activity of hundreds or thousands of users during a time of political turmoil likewise render the search unreasonable. Those harms include the potential to discourage online users from seeking information, voicing their opinions, or participating in the "vast democratic forums of the Internet," thereby chilling protected political participation. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) ("A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. . . . While in the past there may have been difficulty in identifying the most important places

(in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet.'"); *Bonta*, 141 S. Ct. at 2384 ("When it comes to a person's beliefs and associations, broad and sweeping state inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution." (cleaned up)); *see also Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." (quoting *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring))).

The mass, indiscriminate seizure of private information without a sufficient factual basis to connect any of the impacted users (let alone all of them) to the crime under investigation is anathema to the First Amendment and violative of the Fourth Amendment. The search's impact on First Amendment protected activities requires the Warrant to meet Fourth Amendment requirements with scrupulous exactitude—a standard the Warrant fails to meet. For this reason, the Warrant must be quashed.[8]

---

[8] As indicated in the caption of the Warrant, the government relies on 18 U.S.C. § 2703 as the statutory basis for compelling Google to disclose the identified records. As applied to the facts of this case, this use of Section 2703 would unconstitutionally infringe the impacted users' First Amendment right to receive information anonymously and to associate for expressive purposes. Even state action that "*may* have the effect of curtailing" First Amendment freedoms, including as a result of the "*possible* deterrent effect' of disclosure" to the government, is subject to exacting scrutiny. *Americans for Prosperity*, 141 S. Ct. at 2388 (emphasis in original) (cleaned up); *see also id.* at 2383 ("compelled disclosure requirements are reviewed under exacting scrutiny"). The Warrant cannot survive exacting scrutiny because the government cannot show "a substantial relation between [the compelled disclosure] and a sufficiently important governmental interest," *Doe v. Reed*, 561 U.S. 186, 196 (2010) (cleaned up), particularly when the compelled disclosure would impact so many people who have no connection to the crime under investigation. "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights," *id.* (cleaned up), and the compelled disclosure must be "narrowly tailored to the government's asserted interest." *Americans for Prosperity*, 141 S. Ct. at 2383. The Warrant is not sufficiently tailored to provide the "breathing space" that "First Amendment freedoms need . . . to survive." *Id.* at 2384 (cleaned up).

**IV.    The Warrant Imposes an Undue Burden Upon Google and Requires Disclosure of Unusually Voluminous Data**

The Warrant should be quashed for the additional reason that it is unduly burdensome and would require Google to disclose records that are "unusually voluminous." *See* 18 U.S.C. § 2703(d) ("A court issuing an order pursuant to this section, on a motion made promptly by the service provider, may quash or modify such order, if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider").

**A.    Compelled compliance with an unlawful warrant would impose an undue burden upon Google.**

As detailed throughout this Motion, the Warrant is overbroad and unsupported by probable cause, insufficiently particular, and unreasonable. Compelled compliance with the Warrant, which Google "sincerely believe[s] to be an unlawful government intrusion," would impose a "legally cognizable burden" upon it. *In re Apple, Inc.*, 149 F. Supp. 3d 341, 371 (E.D.N.Y. 2016) (analyzing undue burden in the context of the All Writs Act and holding that relevant considerations include not only financial burdens but also "general considerations about reputations or the ramifications of compliance"). Google risks undermining the trust of its users were it to comply with an unconstitutional warrant that targets a large number of its users based on their protected political activities and associations. *See id.* at 369. The burden of compelled compliance is compounded by the fact that the government has already seized the private content and account information of 370 users and continues to expand the reach of its reverse searches.

These burdens are further compounded by the fact that Google is currently barred from speaking about the Warrant. While the one-year nondisclosure order ("NDO") associated with the Warrant may seem reasonable when considered in isolation, it is but one of numerous NDOs imposed upon Google in association with legal process issued in the government's January 6

investigations, some of which have already been in place for years. Google remains gagged from speaking about that body of legal process despite developments that appear to undermine the requisite bases for continued nondisclosure, including that notification could result in flight from prosecution or seriously jeopardize the investigation. *See* 18 U.S.C. § 2705(b). [9] Specifically relevant here, Google remains barred from speaking about Reverse Warrants 1–3 and is unable to provide notice to the hundreds of innocent users whose identifying information was seized by the government despite the fact that more than two years have passed since the warrants were executed. Thus, the Warrant's NDO, considered in the context of the numerous nondisclosure obligations imposed on Google in this and other January 6 investigations, imposes an undue burden upon Google.

**B.      The Warrant would impose an undue operational burden upon Google.**

The Warrant would also impose an undue operational burden on Google. The Warrant directs Google to search for numerous categories of data for a large number of users. To comply, Google would need to engage in a number of iterative steps and searches, many of which would have to be repeated for every responsive user—resulting in Google employees being required to undertake potentially thousands or more individual searches. Adeli Decl. ¶¶ 17–21.

---

[9] For example, this District has issued a public opinion that discusses in detail and even provides a screenshot of a geofence warrant that directed a search of the Capitol on January 6—a warrant that remains sealed and subject to an NDO even today. *Rhine*, 2023 WL 372044. It is inconsistent with the First Amendment, the Stored Communications Act (18 U.S.C. § 2705(b)), and U.S. Department of Justice policy to maintain a blanket gag on Google when the existence of either specific legal process or the government's use of a specific type of legal process in the January 6 investigations is widely discussed by defendants, the government, and the media, and where Google wishes to speak about that legal process and provide notice to the large number of users affected by them. *See* Dep't of Justice, Supplemental Policy Regarding Applications for Protective Orders      Pursuant      to      18      U.S.C.      §      2705(b), https://www.justice.gov/d9/pages/attachments/2022/05/31/section_2705b_supplemental_policy_ -_dag_memo_-_05.27.22_005.pdf.

The Warrant requires Google to search for 537 listed queries. To comply, Google employees would need to create, execute, and monitor numerous queries designed to capture those 537 user queries. *Id*. ¶¶ 7–10. Each query must run line-by-line through a voluminous set of logs that contain the stored daily queries of all Google Search users. *Id*. The queries require substantial computing power and must be monitored for failures. *Id*. ¶ 7. Due to the resources required to run these queries, Google can process only a limited number of queries at the same time. *Id*. A single warrant that would require Google to run dozens or more queries would, therefore, limit Google's ability to process other keyword warrants. *Id*.

After the queries are completed, a Google employee would need to manually check the results to ensure that they match the 537 queries listed in the Warrant. *Id*. ¶ 8. This process would likely take hours to complete and would be vulnerable to human error. *Id*.

A Google employee would then need to manually enter each user's unique identifier into a Google database to retrieve that user's responsive identifying information. *Id*. ¶ 17. On average, a Google employee requires approximately 25 minutes to process a subpoena seeking basic subscriber information for a single Google user. *Id*. To comply with the Warrant, a Google employee would need to perform a similar task as many as 311 times.

The Warrant next requires Google to search for and disclose "[a]ll records" of "devices" associated with the querying accounts and "software used to create and access" the querying accounts. Ex. I Attachment B.I(b). The Warrant provides 15 nonexclusive examples of types of data that fall within this category that Google must search for, and also broadly requires Google to search for and produce "any other unique identifiers that would assist in identifying any such device(s)." *Id.* This definition is vague and, therefore, insufficiently particular. To search for and produce those data points that *are* particularly defined (e.g., "phone numbers"), a Google employee

would need to search each responsive account, unlimited by time, product, or service, to determine whether responsive data exists. Adeli Decl. ¶ 18. The time that would be required to fulfill this request would likely vary by account. *Id*. For example, an account that has been active for 10 years and utilizes numerous Google services would require more time than an account that has been active for three years and utilizes just one Google service. *Id*. Google cannot accurately predict the time required to comply with this portion of the Warrant, but it is likely to be substantial. *Id*.

The Warrant then requires Google to search the querying users' accounts to locate all technically connected users. Ex. I Attachment B.I(c). The Warrant defines the technically connected users as those whose accounts *ever* shared any of the following technical attributes with a querying user's account: "a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (e.g., credit card number), registration or login IP addresses, registration or login cookies or similar technologies, *or any other unique device or user identifier*" to the querying users. *Id*. (emphasis added). The Warrant does not identify the querying users by a particular account identifier, nor does it limit what may constitute "any . . . unique device or user identifier," thereby rendering the Warrant insufficiently particular. *Id*.

The steps required to identify accounts connected by IP login—just one of the many tenuous technical connections that would render an account responsive to the search—are illustrative of the sweeping scope of this request and the burden of complying with it. First, Google employees would need to manually review each querying user's login records and pull all IP addresses associated with their logins. Adeli Decl. ¶ 19. Next, Google employees would need to search for all other Google users who signed in to their accounts from each of those IP addresses. *Id*. As discussed above, this step alone could sweep in thousands of additional users given the prevalent use of public Wi-Fi access points and VPN services. *Id*. ¶ 21.

35

Finally, the Warrant directs Google to search for and seize account-identifying information for every one of the technically connected users. The number of users technically connected to the querying users could potentially number in the hundreds, thousands, or even tens of thousands. *Id.* ¶¶ 20–21. A Google employee would need to engage in an individual search to identify and pull available identifying information for each of those accounts. *Id.* ¶ 19. Even if the search for technically connected users were to yield just 1,000 accounts, Google estimates that it would take a single employee 416 hours, or *more than ten 40-hour work weeks*, to locate and pull responsive identifying information. *Id.*

The numerous manual steps that Google employees must engage in to comply with the Warrant go far beyond what is required of a records custodian for compliance with typical governmental legal process for user data. It is not appropriate to task Google custodians to engage in as many as thousands of manual steps to pull data associated with a single querying user and all users technically connected to that querying user—and to require Google custodians to repeat that process hundreds of times. The manual process would not only be burdensome and time-consuming, but also subject to human error.

**C.    The Warrant improperly requires the production of records that are unusually voluminous.**

Finally, the Warrant should be quashed because it would require Google to produce records that are "unusually voluminous in nature." 18 U.S.C. § 2703(d); *cf. In re Applications of the United States for an Order Pursuant to 18 U.S.C. § 2703(d)*, 206 F. Supp. 3d 454, 455 (D.D.C. 2016) (denying 2703(d) application for "disclosure of records and information, unbounded by any date range, concerning 21 electronic accounts for 9 individuals" that could "result[] in the disclosure of header information concerning 10,000 communications stored in each account" because a more specific showing was required "to justify such a broad disclosure of electronic information"). The

Warrant requires Google to search for and produce to the government numerous categories of data about 311 querying users as well as identifying information for potentially thousands of technically connected users. While Google cannot know the precise volume of data the search will yield without running it, it is likely high, and it is certainly more voluminous than Google's standard productions, thereby rendering the search unusually voluminous.

## CONCLUSION

The Warrant authorizes the government to undertake an unlawful general search that would substantially infringe upon the First Amendment rights and freedoms of potentially thousands of targeted users. It risks chilling the First Amendment activities of over a billion users who turn to Google Search each month to access news and information. Fearful that their queries about political parties—or any other topic—may someday subject them to government scrutiny, users may choose to self-censor or avoid engaging in protected activity on the Internet. The Warrant should be quashed in its entirety.

Date:  July 7, 2023

Respectfully submitted,

**PERKINS COIE LLP**

By:/s/ _____
Hayley L. Berlin (D.C. Bar No. 1011549)
Telephone:  206-359-6161
Fax:  206-359-7161
HBerlin@perkinscoie.com

Todd Hinnen (*Pro hac vice* forthcoming)
Telephone: 206-359-3384
Fax: 206-359-9000
THinnen@perkinscoie.com

Delaney Butler (*Pro hac vice* forthcoming)
Telephone: 206-359-3727
Fax: 206-359-4727
DButler@perkinscoie.com

PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099

*Attorneys for Google LLC*

## CERTIFICATE OF SERVICE

I hereby certify this 7th day of July, 2023, I filed the foregoing under seal with the Clerk

of Court by email to DCD_Intake@dcd.uscourts.gov and have served the following individuals by

email:

Stuart D. Allen, Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
610 D Street, N.W.
Washington D.C. 20530
Stuart.Allen@usdoj.gov
Counsel for the United States

Date: July 7, 2023

/s/Hayley L. Berlin
Hayley L. Berlin